Filed 11/19/24  P. v. Mathison CA3

## NOT TO BE PUBLISHED

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| THE PEOPLE, | C099140 |
| Plaintiff and Respondent, | (Super. Ct. No. 22FE001568) |
| v. | |
| JASON PAUL MATHISON, | |
| Defendant and Appellant. | |

Defendant Jason Paul Mathison was convicted of 38 counts of lewd or lascivious acts on a child and was sentenced to over 76 years in prison.  On appeal, he argues his convictions should be reversed due to several instances of misconduct by the prosecutor during closing argument.  He also argues his counsel provided ineffective assistance by (1) failing to object to the prosecutor's misconduct, (2) failing to move to suppress statements he made during a pretext call on the ground they were involuntary, and (3) stipulating to the admission of statements the victim made to her sister about one of the lewd acts.  We disagree and thus affirm.

1

*The Lewd or Lascivious Acts Involving Mary Doe*

The victim in this case was Mary Doe. Mary spent time in foster care when she was young. Her father died when she was eight, and after his death she lived with her mother, two siblings, and her grandfather. Her older sister Katie described their childhood as "rough" and "chaotic," and testified their mother used drugs and their house was "not a mentally healthy place for anybody to be." Katie testified that after their father died, "the whole family was very socially isolated from each other" and "[n]one of us knew how to process" his death or "how to grieve with each other. We just became very separate islands of people." Mary similarly testified that she "was really disconnected" from her family during this time.

Mary testified she met Mathison on an Internet Web site when she was 11 (which would have been around 2005 or 2006). She posted photos of herself on the site because she "didn't have a lot of friends" and she "wanted to talk to people." Mathison commented on one of her photos and they started communicating through the site. A couple of days later, they started talking and texting via cell phone. Mathison told Mary he lived in Washington with his parents and he was 26, but he later told her "he was a little bit older." Mathison was almost 18 years older than Mary, so he would have been around 29 when Mary was 11.

For the first few weeks after they met, Mary and Mathison "just got to know each other" and "[t]alked about each other's lives and what we liked to do and that kind of stuff." He got her to stop cutting herself and told her not to do drugs. She saw him as a father figure and called him dad, and he called her "his little girl and his princess." She testified he "meant a lot to me."

Mary's sister Katie confirmed that when Mary was around 11 or 12, she communicated with Mathison through a Web site. Katie explained the family shared a

computer, and she saw Mathison's profile picture and messages he and Mary had exchanged.

Mathison bought Mary a Bluetooth earpiece so she could "talk to him on the phone all the time." Mary testified she wore the Bluetooth and was on the phone with Mathison "24/7"; "[w]e would fall asleep on the phone." Katie confirmed Mary was "constantly talking to somebody" using a Bluetooth earpiece.

About a month and a half after Mary and Mathison met online, the relationship became sexual. While they were talking on the phone, Mathison would tell Mary he was "frustrated" and explained how she could relieve his frustration by masturbating. He instructed her how to masturbate and told her to touch her vagina with her hands, and to put "markers and a hairbrush" inside her vagina. While Mary masturbated, Mathison would masturbate too and would "tell [her] how it felt when he was doing it." Mathison also sent her "a box of stuff" that included "dildos" and "anal beads," and he instructed her on how to use them. Mary complied with all of Mathison's instructions because she "just wanted to make him happy." "[H]e was, like — like, my whole world."

Katie confirmed Mary received a package with Mathison's name on the return address, and the package contained a dildo. Katie also testified she once found Mary masturbating with Mathison on a video call, and Mary "had a sex toy inserted into her." Mary was 12 or 13 at the time.

At some point, Mathison told Mary there was a girl who lived next door to him who had told people he molested her. Mathison said he did not molest the girl "but he pled guilty anyways" in order to "get less time." Mary testified one of the reasons she did not tell anybody about her relationship with Mathison was because "he was already in trouble" and "if I told someone, then he would get in trouble again, and then . . . we wouldn't be able to talk anymore." She also testified she thought their relationship was "normal" because "he led me to believe that that's what dads and daughters do . . . together," and "that was how you show that you love each other."

3

Mary met Mathison in person when she was 12. He arranged to meet her at a location "near the train tracks" and close to her house, and they "had sex." She testified that "[i]t hurt" but "I felt it was a good thing to happen because . . . we loved each other."

After their first meeting, Mathison would come to Sacramento about every other month, and Mary would sneak out of her house and she and Mathison would go to a hotel for a night. At the hotel, they would watch movies and have sex "multiple times" a night. "Sex" included intercourse, oral sex, and anal sex. Mary testified she did not enjoy these experiences physically, but "I enjoyed afterwards," "when he would hug me and tell me I did a good job, and we would just cuddle and stuff like that." "[A]fter we had sex, he would . . . give me a lot of affection and stuff like that. So it was kind of like a way to get affection from him." At some point, Mathison and Mary began spending the whole weekend together at a hotel rather than just one night.

Mary testified in detail about an incident involving a knife that occurred when she was 14. She and Mathison were "role-playing" a scene from a movie. Mathison ran a knife down her body and used it to cut off her underwear. She testified Mathison moved the knife "in between my thighs and near my vagina," and "between my [vaginal] lips." Although he did not draw blood or cut her, she testified she "was scared" and "didn't know what was going to happen next" or if she "was going to get hurt." She testified this incident "was the time that I wanted him to fall," which presumably referred to her earlier testimony that there was one time where "[a]fter we had sex and he took a shower by himself, I wanted him to fall and, like hit his head. And I felt guilty about that feeling. And that's when I felt like there was something wrong." On cross-examination, defense counsel asked her, "you kind of felt weirded out by that, correct, the use of the knife?" and she responded, "Not weird. *Scared*." (Italics added.) She testified she told her sister Katie "about the knife thing after it happened," and Katie confirmed this.

When she was 15, Mary flew to Seattle to visit Mathison for a weekend. They stayed in his house, and "did what we always did," i.e., "watch movies and do the sex

4

stuff." She visited him in Seattle one other time when she was 16. This is the last time she saw him in person (which would have been around 2010). By this time, Mary and Mathison were both seeing other people.

*The Pretext Call*

In 2012, Mathison was taken into custody in Washington, and he and Mary continued to communicate with each other. They wrote letters and communicated using a Web site called JPay. Mary testified that, right before he was released, she "reached out to him" because she "missed him" and "was still quite confused. And there was quite a few times during the conversation on JPay where I asked for him to say sorry. [¶] . . . [¶] . . . [f]or . . . all the stuff that he did, . . . like sex." He apologized for "hurting me" and "cheating on me" but "[n]ot about the sex stuff. Not about how young I was or that it was wrong."

Mathison was released from custody in December 2020, and Mary called him. She again asked him "to say sorry, and he said that he could only be sorry for so many years before he had to move on. But I didn't — I didn't move on." After this conversation, Mary contacted the Seattle Police Department and they had her make a pretext call to Mathison.[1] A recording of the pretext call was played for the jury and admitted into evidence.

During the pretext call, Mathison impliedly acknowledged their past relationship was sexual, saying things like "I wish I could be touching you right now," and "I think about you sexually all the time," and I "can't even count all the dreams and daydreams and fantasies and oh yeah." At one point Mary said, "no one's ever made me come the

---

[1] Detective Melanie Edwards explained, "A pretext telephone call is . . . a phone call that's recorded at the direction of a law enforcement officer . . . with the victim and the suspect. And we are guiding the victim as to what to say to see if the suspect will admit to the acts" or make "an adoptive admission" by "not denying what occurred."

way you have," and Mathison responded, "Ah," "Yeah." Mary said her current boyfriend "doesn't even go down on me like you did," and Mathison responded, "Oh man. I'm sorry that he doesn't do that. Sorry to hear that." Mary then said, "And you would use your fingers," and Mathison responded, "Oh man, Mary. You are — oh my gosh. Yeah. Well . . . physically our chemistry is amazing. Right?"

Mary mentioned the knife incident during the call, and said, "the only thing that's . . . holding me back is . . . how rough it got sometimes," and "I think a lot about . . . the knife thing in the hotel and that's, like the only thing I'm worried about." Mathison responded, "Oh, okay. I think I follow you. And yeah that's not — remember I'm — I'm someone who — I am a giver. I — I become and act how . . . I think someone wants and needs. Right? And so yeah anything like that was — I — I mean — I like to please and be what the other person wants." Mary then said, "I was 14 I didn't really know what I wanted," and Mathison responded, "Yes, exactly."

At another point, Mary said, "I was, you know, only, like, in seventh grade or whatever," and Mathison responded, "Yeah." Mary asked Mathison how old he told his family she was, and he responded, "I've never said," and "they've never really asked, but I think they . . . kinda know and don't wanna ask. Um, so yeah. So it would be more of a well she wasn't totally honest about my age and I wasn't totally honest about . . . her age and I wasn't totally honest about my age and now it's not a problem. Right?"

Mathison was arrested sometime after the pretext call was made.

*Page Doe's Testimony Pursuant to Evidence Code Section 1108*

Page Doe testified pursuant to Evidence Code section 1108, which "allows . . . evidence of prior uncharged sexual offenses to prove propensity."[2] (*People v. Villatoro*

---

[2] Evidence code section 1108 provides, "In a criminal action in which the defendant is accused of a sexual offense, evidence of the defendant's commission of another sexual offense or offenses is not made inadmissible by Section 1101, if the evidence is not

(2012) 54 Cal.4th 1152, 1160.) Prior to her testimony, the jury was informed of the following stipulations: (1) in 2005, Mathison was convicted in Washington of two counts of felony first degree rape of a child and of felony possessing depictions of minors engaged in sexually explicit conduct, and (2) Page was the victim.

Page testified she met Mathison in 2004 when she was nine. She lived with her father, and Mathison lived next door. She met Mathison when she asked if she could pet his cat. They became friendly, and she would spend time at his apartment after school when her dad was not home. She would play with Mathison's cat, and they would watch movies.

One day, Mathison showed Page his penis and later asked her to touch it and showed her how to stimulate him. He would masturbate himself while touching her vagina, put his penis to her genitalia, and ejaculate onto her stomach. He told her he loved her, and "this is what good girls do, and not to tell anyone, and it would be our secret," and if she told anyone, he would go to prison. Page testified she didn't want him to go to prison "because of the relationship that we formed."

*The Verdict*

Mathison was charged with 29 counts of lewd or lascivious acts on a child under the age of 14 in violation of Penal Code section 288, subdivision (a), and with nine counts of lewd or lascivious acts on a child of 14 or 15 who was at least 10 years younger than Mathison, in violation of Penal Code section 288, subdivision (c), and it was also alleged Mathison used a deadly weapon (a knife) during the commission of one of the Penal Code section 288, subdivision (c) counts (count thirty). The jury found Mathison

---

inadmissible pursuant to Section 352." (Evid. Code, § 1108, subd. (a).) "Section 1108 provides the trier of fact in a sex offense case the opportunity to learn of the defendant's possible disposition to commit sex crimes." (*People v. Falsetta* (1999) 21 Cal.4th 903, 915.) Mathison does not challenge the admissibility of Page's testimony.

guilty of all 38 counts and found true the allegation that he used a knife during the commission of count thirty.

## DISCUSSION

### I

### *Alleged Misconduct During Closing Argument*

Mathison argues the prosecutor committed four types of misconduct or error during closing argument. He acknowledges his counsel did not object to any of the alleged misconduct. He also acknowledges the general rule that " ' "[a] defendant may not complain on appeal of prosecutorial misconduct unless in a timely fashion, and on the same ground, the defendant objected to the action and also requested that the jury be admonished to disregard the perceived impropriety." ' " (*People v. Centeno* (2014) 60 Cal.4th 659, 674.) He argues, however, that his failure to object should be excused because " 'an objection would have been futile or an admonition ineffective.' " (*People v. Jackson* (2016) 1 Cal.5th 269, 367.)

In the next four sections we separately analyze each alleged instance of misconduct.

#### A. *Statements about undercharging*

Mathison complains about the prosecutor's statement during closing argument that "we undercharge. We only charged ten, ten, three, and one counts for those, even though Mary assured us it was many, many more. Because we want to make sure we're well within that estimate that she gave us. Because the number I charged probably happened about every weekend that she was with him." Mathison complains these statements about undercharging "were based on assertions of personal knowledge based on facts outside the record — the assurances made by the complaining witness about the number of incidents of molestation — before the prosecutor made its charging decision," and because they went to Mary's credibility and the truth of her allegations, they unfairly infected the trial. We disagree.

8

" '[S]tatements of facts not in evidence by the prosecuting attorney in his argument to the jury constitute misconduct.' " (*People v. Armstrong* (2019) 6 Cal.5th 735, 797; see also *People v. Benson* (1990) 52 Cal.3d 754, 794 ["a prosecutor may not go beyond the evidence in his argument to the jury"].)  Here, however, the prosecutor's statements about undercharging accurately reflect (1) the actual charges in the felony complaint, and (2) Mary's testimony about the number of sexual acts.

The prosecutor made the challenged statements when she was discussing counts "6 through 29.  And these all relate to the abuse at the hotel" when Mary was 12 or 13.  The prosecutor then described counts six through twenty-nine as including "ten separate counts of penis to genitalia at hotel.  That's having sex.  Ten separate counts of penis to mouth.  Three separate counts of penis to butt, relating to the anal sex that Mary described.  And then one count of his mouth to her genitalia."  The prosecutor's description accurately tracks counts six through twenty-nine as alleged in the information.

The prosecutor then stated, "the estimates [Mary] gave us were 40 times of intercourse during this time [i.e., at the hotel when she was 12 and 13] . . . , 30 times of oral copulation, eight times of anal sex, and at least more than once of the oral copulation of [Mathison] putting his mouth to her genitalia.  [¶]  And Mary was very clear under stringent cross-examination that those were the absolute lowest possible estimates."  Again, this is an accurate description of Mary's testimony.

Mary testified she and Mathison went to a hotel "every other month or so" when she was 12 and 13, and they would have sex "three or four times" a night and she would "go down on him" (which she explained meant she would put "his penis in his [*sic*] mouth") "like three times."  In response to the prosecutor's questions, she confirmed this would occur "all within one night."  She testified some of the hotel trips lasted a whole weekend rather than just a single night, and on those occasions, she and Mathison would have sex "[a] lot" more often.  She was asked how many times she and Mathison had sex

9

"at the hotel when you were still 12 and 13," and she responded, "At least 40." She was also asked how many times Mathison put his penis in her mouth during that same time period, and she responded, "30 or more." Finally, she testified she and Mathison had "anal sex" "[p]robably eight" times during this time period. On cross-examination, she was asked whether the numbers she gave (i.e., "30 or 40") were "estimates," and she responded, "Low end, yes." She was then asked, "Could have been less times, couldn't it?" and she responded, "No."

After accurately recounting Mary's estimates, the prosecutor then made the statement Mathison now challenges: "But keeping in mind that these are just estimates, I acknowledge that. That's why we undercharge. *We only charged ten, ten, three, and one counts for those, even though Mary assured us it was many, many more*." (Italics added.) This statement is not based on facts not in evidence, nor does it amount to unsworn testimony by the prosecutor. Instead, it accurately compares Mary's testimony with the counts alleged in the felony complaint.

As for the prosecutor's comment that "the number I charged probably happened about every weekend that she was with him," it is at best the type of "vigorous, colorful argument[] with obvious hyperbole" that prosecutors are permitted to make during closing. (*People v. Lewis* (2004) 117 Cal.App.4th 246, 259.) It is also a fair description of Mary's testimony, because she testified she and Mathison would have sex three or four times a night, and when she and Mathison spent the whole weekend together would have sex "[a] lot" more often, and, in particular, they would have sex "seven to ten" times.

In short, we find no misconduct or error in the prosecutor's statement during closing argument about undercharging Mathison.

B. *"Nobody is making up that they're the victim of molest"*

Mathison also complains about the following portion of the prosecutor's closing argument: "Mary has no reason to lie. [Mathison] was the only father she'd ever known, I think is how she put it. It probably doesn't take a lot of argument to explain to you that

10

it's not cool to be known as the victim of molest.  It's not something you brag about.  It's not something that's fun to talk about at parties.  *Nobody is making up that they're the victim of molest*."  (Italics added.)  Mathison argues the statement that "[n]obody is making up that they're the victim of molest" was misconduct, because no evidence was introduced at trial that would support a finding that nobody ever makes up false allegations of molestation, and "a prosecutor may not go beyond the evidence in his argument to the jury."  (*People v. Benson, supra*, 52 Cal.3d at p. 794.)  For the reasons explained below, we ultimately conclude this statement did not constitute misconduct, and even if it did, Mathison waived the argument by not objecting.

A prosecutor's statements during closing argument " 'must be judged in the context in which they are made.' "  (*People v. Gonzalez* (1990) 51 Cal.3d 1179, 1224, fn. 21.)  Moreover, " '[A] court should not lightly infer that a prosecutor intends an ambiguous remark to have its most damaging meaning or that a jury, sitting through lengthy exhortation, will draw that meaning from the plethora of less damaging interpretations.' "  (*Ibid*.; see also *People v. Frandsen* (2019) 33 Cal.App.5th 1126, 1151 ["To prevail on a claim of prosecutorial misconduct based on the prosecutor's remarks to the jury, the defendant must show a reasonable likelihood the jury understood or applied the complained-of comments in an improper or erroneous manner"].)  Here, the challenged statement was preceded by several statements Mathison does not challenge and that in any event do not constitute misconduct, and those initial statements provide context for the challenged statement.

For example, Mathison does not challenge the prosecutor's statement that "Mary has no reason to lie.  [Mathison] was the only father she'd ever known, I think is how she put it," and the evidence supports this statement.  Mary's father died when she was eight, and she testified her relationship with Mathison was "like a dad and daughter relationship."  She was asked, "Why did you let him do those things?" and she responded, "Because . . . I did love him, you know, like — even with everything that

11

happened, . . . because I didn't have a dad, he was the dad that I knew kind of situation."
And again: "It's . . . really hard to explain . . . how normal everything felt to me, and the
love that I had for him kind of replaced the love that I had — had for my dad." Finally,
she testified that she felt "bad" and guilty" about testifying against him at trial because
she "still . . . love[d] him and care[d] for him" and "for the most part, [she was] able to
separate . . . the bad that he did and the good that he did." This testimony supports the
prosecutor's argument that Mary had no reason to lie about the abuse because Mathison
was a father figure to her, she still loved him, and she felt bad testifying against him.

Mathison also does not challenge the prosecutor's statements that "it's not cool to
be known as the victim of molest," and it is not something you "brag about" or "talk
about at parties," and even if he did, we believe those statements are a permissible
example of a prosecutor " 'draw[ing] from matters that are " ' " 'not in evidence, but
which are *common knowledge* or are illustrations drawn from common experience
. . . .' " ' " ' [Citation.] '[F]acts are deemed within the common knowledge of the jury
only if they are *matters of common human experience* or well known laws of natural
science.' " (*People v. Rodriguez* (2020) 9 Cal.5th 474, 481, italics added.)

Viewed in context, we find the jury would have understood the prosecutor's final
statement — i.e., "Nobody is making up that they're the victim of molest" — as simply
one more example of the fact, based on common knowledge, that it is difficult and
uncomfortable to talk being the victim of molest. Alternatively, we find the jury would
have understood it as stating, "Mary is not making up that she's the victim of molest,"
and, for the reasons we explain in the section below on vouching,[3] we find such a
statement was well within the prosecutor's "wide latitude to discuss and draw inferences

---

[3]     Mathison also contends the statement constitutes improper vouching.

from the evidence presented at trial." (*People v. Frandsen, supra*, 33 Cal.App.5th at p. 1151.)

C.    *Mary has been "telling people for a decade" about the knife incident*

The prosecutor told the jury, "Mary told [her sister Katie] about the abuse with the knife when Mary was 16. And you're allowed to use this as corroboration. The fact that Mary isn't just talking about the knife for the first time now. *She's been telling people for a decade that that happened*. Because it did. It stayed with her since then. And *that's why she's been telling people*." (Italics added.) Mathison again cites the rule that " '[s]tatements of facts not in evidence by the prosecuting attorney in his argument to the jury constitute misconduct' " (*People v. Armstrong, supra*, 6 Cal.5th at p. 797), and he argues the italicized statements are of facts not in evidence, because the evidence shows (1) Mary only told one person (Katie) about the knife incident, not "people," and (2) she told Katie about the incident only once, two years after it happened (which would have been around 2010), not "for a decade." This is not accurate.

Aside from telling her sister, Mary testified that her "current partner" — i.e., the person with whom she was in a relationship at the time of trial, in 2023 — "knows about the knife thing." " ' "It is settled that a prosecutor is given wide latitude during argument. The argument may be vigorous as long as it amounts to fair comment on the evidence, which can include reasonable inferences, or deductions to be drawn therefrom." ' " (*People v. Williams* (1997) 16 Cal.4th 153, 221.) Having told her sister and her partner about the incident with the knife, it was thus not error for the prosecutor to say during closing argument that Mary has been telling "people" (i.e., Katie and her current partner) about the knife incident "for a decade" (i.e., in around 2010 and 2023).

D.    *Vouching*

Mathison's final complaint is that the prosecutor impermissibly "vouched" for her witnesses during closing argument. In particular, he complains about the following statements: "Mary did not make that up. She is telling the truth because she has no

13

reason to lie, and you have no evidence that she was lying." And, "She's been honest since day one, and that's what you heard. [¶] That's why I'm asking you to believe Mary and believe Page, because what they described to you about [Mathison's] abuse is exactly what happened." And, "Mary and Page and Katie came in to testify against [Mathison]. They showed their incredible courage to do so. They told you the truth, even though it was very hard for them." And finally, "Mary has no reason to lie. . . . Nobody is making up that they're the victim of molest."

"The prosecutor is generally precluded from vouching for the credibility of her witnesses, or referring to evidence outside the record to bolster their credibility." (*People v. Anderson* (1990) 52 Cal.3d 453, 479.) " 'Impermissible "vouching" may occur where the prosecutor places the prestige of the government behind a witness through personal assurances of the witness's veracity or suggests that information not presented to the jury supports the witness's testimony.' " (*People v. Williams, supra*, 16 Cal.4th at p. 257.) However, " 'Prosecutorial assurances, based on the record, regarding the apparent honesty or reliability of prosecution witnesses, cannot be characterized as improper 'vouching,' which usually involves an attempt to bolster a witness by reference to facts outside the record.' [Citation.] No impermissible 'vouching' occurs where 'the prosecutor properly relie[s] on facts of record and the inferences reasonably drawn therefrom, rather than any purported personal knowledge or belief.' " (*Ibid*., italics omitted.) "Although a prosecutor may not personally vouch for the credibility of a witness, a prosecutor may properly argue a witness is telling the truth based on the circumstances of the case." (*People v. Boyette* (2002) 29 Cal.4th 381, 433.)

We find the prosecutor's remarks were based on inferences reasonably drawn from facts in the record, and that no improper vouching occurred. This is particularly true where, as here, the prosecutor preceded the challenged remarks by marshalling all of the evidence that corroborated Mary's testimony. She started out by stating, "When we're looking at what to believe, we call it corroboration. That's evidence that supports what

14

Mary said, what Page said, what Katie said. [¶] So what supports how Mary described her experiences?" The prosecutor then described in detail the evidence that supported or corroborated Mary's testimony, including: the pretext call; a box that Mathison sent to her postmarked September 29, 2008, (when she would have been 14); letters Mathison sent her from jail that corroborated certain details of Mary's testimony; those portions of Katie's testimony that corroborated certain details of Mary's testimony; Page's testimony describing similar abuse despite the fact that Mary and Page did not know each other; and Mathison's 2005 conviction for sexually abusing Page. It was only *after* describing all of this corroborating evidence that the prosecutor said, "Mary did not make [her testimony] up," and, "She is telling the truth," and, "That's why I'm asking you to believe Mary and believe Page," and, "Mary and Page and Katie . . . told you the truth." We find the challenged statements were based on " 'facts of record and the inferences reasonably drawn therefrom, rather than any purported personal knowledge or belief,' " and thus " 'cannot be characterized as improper "vouching." ' " (*People v. Williams, supra*, 16 Cal.4th at p. 257.)

To summarize, we find no misconduct or error in the prosecutor's statements during closing argument. Having found no misconduct, we need not address Mathison's claim of ineffective assistance of counsel.

## II

*Challenges to the Pretext Call*

Mathison argues any incriminating statements he made during the pretext call from Mary were inadmissible because she was acting as a police agent and his statements were involuntary, and his counsel provided ineffective assistance by failing to object to the admission of the pretext call on this ground. We disagree.

*A.     Additional background*

As noted above, the Seattle police had Mary make a pretext call to Mathison as part of their investigation, and a recording of the call was played for the jury.

15

Defense counsel filed a motion in limine to exclude the pretext call. He argued the call was irrelevant because Mathison did not actually admit to a prior sexual relationship with Mary. He also argued the call was hearsay, lacked foundation, was more prejudicial than probative, and was misleading and confusing. Defense counsel did not move to exclude the call on the ground Mathison urges now (i.e., that his statements were "involuntary" and made "as a result of police coercion"). The trial court admitted the pretext call, subject to the parties' stipulations that certain inadmissible portions be redacted.

### B.    Analysis

"Any involuntary statement obtained by a law enforcement officer from a criminal suspect by coercion is inadmissible pursuant to the [due process clause of the] Fourteenth Amendment to the federal Constitution and article I, section 7 of the California Constitution." (*People v. Dykes* (2009) 46 Cal.4th 731, 752; see also *People v. Neal* (2003) 31 Cal.4th 63, 79 ["It long has been held that the due process clause of the Fourteenth Amendment to the United States Constitution makes inadmissible any involuntary statement obtained by a law enforcement officer from a criminal suspect by coercion"].) A due process violation always requires "some sort of 'state action,' " and even "[t]he most outrageous behavior by a private party seeking to secure evidence against a defendant does not make that evidence inadmissible under the Due Process Clause." (*Colorado v. Connelly* (1986) 479 U.S. 157, 165, 166.) Thus, "A finding of coercive *police* activity is a prerequisite for a finding that a confession was involuntary under the due process clauses of the federal or the state Constitution." (*People v. Mayfield* (1997) 14 Cal.4th 668, 759, overruled in part on other grounds in *People v. Scott* (2015) 61 Cal.4th 363, 390 & fn. 2.)

Mathison argues Mary was acting as a police agent when she made the pretext call, and the call was thus "effectively a police interview of [a] suspect, with the police employing the complaining witness as the interviewer." Assuming, solely for the sake of

16

argument, that Mary was acting as a police agent during the pretext call, that does not end our inquiry. Mathison would still have to convince us that the statements he made during the call were involuntary or coerced. This he has failed to do.

Mathison argues any admissions he made during the pretext call "were involuntary because they were motivated by an implied promise of immunity or leniency and an implied threat of prosecution." Factually, this argument does not make sense. Mathison acknowledges he did not know Mary made the call at the behest of the police (indeed, that is the point of a pretext call), and he also acknowledges that in light of our Supreme Court's opinion in *People v. Hill* (1967) 66 Cal.2d 536, 549, the question is whether he was "given to understand that he might reasonably expect benefits in the nature of more lenient treatment at the hands of the police, prosecution or court" in return for a confession. Here, however, Mary was not "the police, prosecution, or court," and Mathison fails to explain how Mary could have impliedly promised him immunity or threatened him with prosecution.

At best, Mary could report him to the police or agree not to do so, and it is this possibility that Mathison's due process claim is really based on. He states he "was *given to understand* that . . . Mary would not report him . . . if he validated her, apologized, and told her what she wanted to hear." (Italics added.) We have reviewed the pretext call, and Mary never says anything that contains even the slightest hint she would not report him if he apologized (or that she would report him if he didn't apologize).

In his opening brief, Mathison acknowledges his understanding was based not on anything Mary said *during* the pretext call itself, but on statements she made during a prior phone call *before* she went to the police. Mathison fails to explain how statements Mary made *before she contacted the police* can be attributed to the police for due process purposes. Again, "coercive *police* activity is a prerequisite for a finding that a confession was involuntary." (*People v. Mayfield, supra*, 14 Cal.4th at p. 759.) And here, the alleged coercion occurred *before* any police involvement.

17

Lastly, we note Mathison does not cite a single case that holds a victim's express or implied promise during a pretext call not to report a defendant if he or she apologized makes the defendant's incriminating statements either involuntary or coerced for due process purposes. Mathison cites 22 cases in this portion of his brief, and *none* involve statements made during a pretext call. We find the absence of such cases telling. Twenty-one of the 22 cases cited by Mathison involve statements made during a police interview or the equivalent. (See *Michigan v. Tucker* (1974) 417 U.S. 433, 436-438 [questioning by police]; *People v. Neal, supra*, 31 Cal.4th at pp. 80-85 [statements to detective]; *People v. McWhorter* (2009) 47 Cal.4th 318, 342-343 [statements to detectives]; *People v. Williams* (2010) 49 Cal.4th 405, 435 [statements to authorities]; *Hutto v. Ross* (1976) 429 U.S. 28, 30 [statement made during plea negotiations at request of prosecutor]; *People v. Jones* (2017) 7 Cal.App.5th 787, 810 [statements to police]; *People v. Holloway* (2004) 33 Cal.4th 96, 112-114 [statement to police]; *People v. Andersen* (1980) 101 Cal.App.3d 563, 574, 586 [confession to police]; *People v. Hill, supra*, 66 Cal.2d at p. 547 [statements to police]; *Jackson v. Denno* (1964) 378 U.S. 368, 371-372 [statements to police and district attorney]; *People v. Dykes, supra*, 46 Cal.4th at pp. 750-751 [confession given to officers]; *Dickerson v. United States* (2000) 530 U.S. 428, 432 [statement to Federal Bureau of Investigation]; *Blackburn v. Alabama* (1960) 361 U.S. 199, 204 [confession to officers]; *Schneckloth v. Bustamonte* (1973) 412 U.S. 218, 220-223 [consent given to police for search]; *People v. Wall* (2017) 3 Cal.5th 1048, 1063-1066 [confession to detectives]; *People v. Maury* (2003) 30 Cal.4th 342, 405-409 [statements to district attorney, police, and psychiatrist retained by police and identified to the defendant as such]; *Colorado v. Connelly, supra*, 479 U.S. at pp. 160-162 [confession to police]; *Townsend v. Sain* (1963) 372 U.S. 293, 297-299 [confession and statements to police and prosecutor]; *Beckwith v. United States* (1976) 425 U.S. 341, 341-342 [statement to Internal Revenue Service agent investigating criminal income tax violations]; *U.S. v. Preston* (9th Cir. 2014) 751 F.3d 1008, 1012-1015 [statements to

18

Federal Bureau of Investigation]; *Williams v. Brewer* (S.D. Iowa 1974) 375 F.Supp. 170, 172 [statements to police officer].)

The one case Mathison cites that does not involve a police interview — *Arizona v. Fulminante* (1991) 499 U.S. 279 — is easily distinguishable. That case involved an inmate who worked as a paid Federal Bureau of Investigation informant, and a defendant who was suspected of killing his stepdaughter and who was in prison on unrelated charges. At the Federal Bureau of Investigation's request, the informant approached the defendant and said he knew the defendant was " 'starting to get some tough treatment' " from other inmates because of a rumor he had killed a child. The informant offered to protect the defendant from the other inmates, but told him, " ' "You have to tell me about it . . . [f]or me to give you any help," ' " and the defendant then admitted to the informant he had killed his stepdaughter. (*Id*. at p. 283.) The defendant was convicted of murder, and the United States Supreme Court ultimately held the "confession was coerced" because there was "a credible threat of physical violence" at the hands of other inmates "unless [the defendant] confessed." (*Id*. at p. 287.) Simply put, the case before us is nothing like *Fulminate* and it provides no support for Mathison's argument that the statements he made during the pretext call were involuntary or coerced.

Having carefully reviewed both the pretext call and Mary's testimony about the events leading up to that call, we find that any admissions Mathison made during the call were voluntary and were not made as a result of coercive police conduct. And because Mathison's statements were not involuntary or coerced, it was not ineffective assistance of counsel to fail to move to exclude the statements on such grounds. (See *People v. Bradley* (2012) 208 Cal.App.4th 64, 90 ["Failure to raise a meritless objection is not ineffective assistance of counsel"]; *People v. Jones* (1979) 96 Cal.App.3d 820, 827 [counsel not required to "advance meritless arguments" in order to avoid ineffective assistance claim].)

## III

### *Mary's Statements to Katie About the Knife Incident*

Mathison argues his counsel was ineffective in stipulating to the admission of Mary's statements to her sister Katie about the knife incident. This argument applies only to count thirty, which charged Mathison with committing a lewd or lascivious act on Mary, and which further alleged he "used a deadly weapon, to wit, a knife," in the commission of the offense.

#### A. *Additional facts*

Prior to trial, defense counsel filed a motion in limine (No. 6) to exclude statements Mary made to Katie about the knife incident, arguing the statements were hearsay and they were not admissible pursuant to the fresh complaint doctrine. The People filed a competing motion in limine (No. 3) to admit Mary's statements to Katie about the knife incident, arguing they were admissible pursuant to the fresh complaint doctrine.

During the hearing on the motions in limine, the court asked if there was an offer of proof, and the prosecutor stated she anticipated Katie would testify "she did hear from Mary about the role-playing that [Mathison] was going to stab her during sex, and that Mary participated in that and felt horrible." The prosecutor stated the offer of proof was "based on an interview that Katie gave to [a] detective in Seattle," and she noted her detective had tried to get a statement from Katie but was unable to do so. Defense counsel noted Katie's statement to the Seattle detective was "a fairly brief statement and was lacking in many details," and he asked for "a little more clarification" about Katie's anticipated testimony. The court reserved ruling on the motion subject to a more detailed offer of proof from the prosecutor.

Later, defense counsel and the prosecutor *stipulated* that Katie's testimony "[a]s far as the Fresh Complaint statements . . . will just be limited to . . . one statement . . . , specifically, . . . that when Mary was 16, Mary told Katie about the incident with a knife,

20

that there was role-playing with the knife during sex, and that Mary was very upset and bothered by that event. That event happened when Mary was 14." It is this stipulation that Mathison contends constitutes ineffective assistance of counsel.

At trial, Katie provided the following testimony:

"Q: [D]o you ever remember Mary telling you about an incident with Mr. Mathison and a knife?

"A: I do recall that."

Defense counsel objected on hearsay grounds, the prosecutor reminded the court "this was dealt with in People's Motion in Limine No. 3," and defense counsel responded, "Oh, that's right. Okay. Withdraw the objection." Katie's testimony then continued:

"Q: [A]bout how old was Mary when she told you about this?

"A: She was about 16.

"Q: Okay. Did she tell you how old she was when it happened?

"A: She didn't. She indicated it had happened a few years previously.

"Q: Okay. A few years before when she told you at 16?

"A: Yes.

"Q: Did she say whether . . . she was having a sexual experience with Mr. Mathison at the time?

"A: Yes, she did indicate she was having a sexual experience. They were having sex.

"Q: What did she tell you about the knife?

"A: *That he brought a knife out and wanted her to pretend like he was stabbing her and hurting her while they were having sex.*

"Q: Did she tell you how she had felt about that?

"A: She described that, after he finished, he went to go take a shower, and *she was just overwhelmed by wishing that he would fall and hit his head so that she didn't have to*

21

*see him again or be around him anymore*." (Italics added.)

### B.    Analysis

Pursuant to what is often referred to as the fresh complaint doctrine, "proof of an extrajudicial complaint, made by the victim of a sexual offense, disclosing the alleged assault, may be admissible for a limited, nonhearsay purpose — namely, to establish the fact of, and the circumstances surrounding, the victim's disclosure of the assault to others — whenever the fact that the disclosure was made and the circumstances under which it was made are relevant to the trier of fact's determination as to whether the offense occurred." (*People v. Brown* (1994) 8 Cal.4th 746, 749-750.) Such evidence is admissible "in order to forestall the trier of fact from inferring erroneously that no complaint was made, and from further concluding, as a result of that mistaken inference, that the victim in fact had not been sexually assaulted." (*Id*. at pp. 748-749.) "[O]nly the fact that a complaint was made, and the circumstances surrounding its making, ordinarily are admissible; admission of evidence concerning details of the statements themselves, to prove the truth of the matter asserted, would violate the hearsay rule." (*Id*. at p. 760.) "On request, the trial court must instruct the jury as to the limited purpose for which the fresh complaint evidence was admitted. [Citation.] However, the trial court has no duty to give such an instruction in the absence of a request."[4] (*People v. Manning* (2008) 165 Cal.App.4th 870, 880.)

Mathison argues his counsel was ineffective in stipulating to the admission of Katie's testimony because it was not limited to the fact that Mary made the complaint and the circumstances surrounding its making and was too detailed. He appears to concede it

---

[4]    Mathison notes his counsel "did not request, and the trial court did not give, a limiting instruction that would have instructed the jury that it may consider the fresh complaint evidence solely for the purpose that a complaint was made and not as proof of the truth of the content of the complaint," but he does *not* contend his counsel was ineffective in failing to request such an instruction.

22

was proper for Katie to testify Mary told her about "an incident with [Mathison] and a knife" that occurred "a few years previously." He contends, however, that it was improper for her to testify Mary stated (1) Mathison "brought out a knife and wanted her to pretend like he was stabbing her and hurting her while they were having sex," and (2) after the incident "she was just overwhelmed by wishing that he would fall and hit his head [in the shower] so that she didn't have to see him again or be around him anymore."

The People state they "partially agree[] . . . that a portion of Katie's testimony regarding the knife incident went beyond the 'fact' of the disclosure" because it included "some details" about the incident itself, and, "[a]s a result, this part of Katie's testimony was inadmissible hearsay that did not fall under the fresh complaint exception, and therefore, counsel's decision not to object to its admission was deficient."

We stress at the outset that Mathison does not contend his counsel's *failure to object* to Katie's testimony constituted ineffective assistance. Instead, he contends his counsel's *stipulation* constituted ineffective assistance. The two are not the same.

As noted above, defense counsel *stipulated* Katie's testimony would be "*limited*" (italics added) to just "one statement" that "when Mary was 16, Mary told Katie about the incident with a knife, that there was role-playing with the knife during sex, and that Mary was very upset and bothered by that event. That event happened when Mary was 14." The question presented in this appeal is thus whether *this stipulation* constituted ineffective assistance of counsel.

Katie's testimony arguably went beyond the stipulation, because the stipulation made no mention of Mary telling Katie about Mathison pretending to stab or hurt her, and no mention of Mary telling Katie she wanted Mathison to fall and hit his head so she didn't have to see him again. When Katie's testimony went beyond the stipulation, defense counsel could have objected and moved to strike, but he did not, and, again, Mathison's ineffective assistance claim is based on the stipulation, not on the failure to

23

object.[5]  Thus, whether or not Katie's actual testimony was admissible under the fresh complaint doctrine is not the issue.

As for the stipulation, it is not ineffective assistance of counsel to stipulate to the admission of evidence that is admissible.  (See *People v. Cudjo* (1993) 6 Cal.4th 585, 616 [where "there was no sound legal basis for objection, counsel's failure to object to the admission of the evidence cannot establish ineffective assistance"]; *People v. Scaffidi* (1992) 11 Cal.App.4th 145, 155 [not ineffective assistance of counsel to fail to object to admissibility of confession that was admissible].)  And we find the stipulated testimony — i.e., "Mary told Katie about the incident with a knife, that there was role-playing with the knife during sex, and that Mary was very upset and bothered by that event" — was admissible pursuant to the fresh complaint doctrine because it was evidence "of an extrajudicial complaint, made by the victim of a sexual offense, disclosing the alleged assault," and used "to establish the fact of, and the circumstances surrounding, the victim's disclosure of the assault to others."  (*People v. Brown, supra*, 8 Cal.4th at pp. 749-750.)  Because his argument focuses on Katie's actual testimony, Mathison does not suggest otherwise.  To the extent he contends even the stipulated testimony went beyond "the fact that a complaint was made and the circumstances surrounding its making," and contained too many "details," we disagree.  (*Id*. at p. 760.)

The line between the fact that a complaint was made and the circumstances of its making (which is permissible) and the details of the complaint (which is not) is not

---

[5]  Even if the ineffective assistance claim was based on the failure to object, we would reject it because there could have been a tactical reason for not objecting — namely, not wanting to focus the jury's attention on Katie's testimony — and "deciding whether to object is inherently tactical, and the failure to object will rarely establish ineffective assistance."  (*People v. Hillhouse* (2002) 27 Cal.4th 469, 502; see also *People v. Harris* (2008) 43 Cal.4th 1269, 1290 ["counsel could . . . have decided that objecting would focus the jury's attention on the . . . incident in ways that would not be helpful to the defense"].)

always clear cut. Although the "details cannot be recounted," the evidence is *not* limited "to the bare fact that the victim 'made a complaint' as to an unspecified subject matter," because such evidence "would be meaningless." (*People v. Burton* (1961) 55 Cal.2d 328, 351, italics omitted.) As noted above, the purpose of the fresh complaint doctrine is to "forestall the trier of fact from inferring erroneously that no complaint was made, and from further concluding, as a result of that mistaken inference, *that the victim in fact had not been sexually assaulted*." (*People v. Brown, supra*, 8 Cal.4th at pp. 748-749, italics added.) Given this purpose, and to use this case as an example, it "would be meaningless" to allow Katie to testify only that Mary complained about Mathison, or even that she complained about an incident involving Mathison and a knife, without also allowing her to testify the complaint *was about an alleged sexual assault*, because "if the complaint did not relate to the alleged offense . . . , it would be immaterial to the proof of the People's case." (*Burton*, at p. 351.) Under the fresh complaint doctrine it is thus proper to admit evidence that shows " '*the complaint **related to the matter being inquired into** . . .* ' [citation]; *that is, the alleged victim's statement of the nature of the offense and the identity of the asserted offender, without details, is proper*." (*Ibid.*, bolding added.)

Here, the testimony at issue related solely to count thirty, which charged Mathison with committing a lewd or lascivious act on a 14- or 15-year-old child and which further alleged he used a knife in the commission of the offense. In order for Katie's testimony to be material, it had to link Mary's complaint *to that alleged offense*. We find the stipulated testimony did just that, and it did not go beyond what is permissible.

Mathison also argues Katie's testimony was inadmissible because there was an "unreasonable delay" in Mary's reporting of the knife incident to Katie. We disagree, for two reasons. First, as our Supreme Court stated in *People v. Brown, supra*, 8 Cal.4th 746, "evidence of the fact and circumstances of a victim's complaint may be relevant for a variety of nonhearsay purposes, regardless whether the complaint is prompt or delayed,"

25

and "the admissibility of such evidence does not turn invariably upon whether the victim's complaint was made immediately following the alleged assault or was preceded by some delay." (*Id*. at pp. 761, 763.) This is particularly true where, as here, the victim is a child, because "[c]hild victims, in particular, commonly are reluctant to report such incidents and delay in doing so." (*Id*. at p. 758.)

Second, we agree with a recent decision by the Fourth Appellate District that held "delay in disclosing sexual abuse does not affect the *admissibility* of the disclosure and should instead be considered by the trier of fact as one factor in evaluating its *weight*." (*People v. Flores* (2024) 101 Cal.App.5th 438, 443, italics added.) Mary's delay in telling Katie about the incident thus went to the weight of the evidence, not to its admissibility.

## IV

### *Cumulative Error*

Mathison's final argument is that even if we find no single error requires reversal, cumulative error does. We disagree. It is true that "a series of trial errors, though independently harmless, may in some circumstances rise by accretion to the level of reversible and prejudicial error." (*People v. Hill* (1998) 17 Cal.4th 800, 844.) Here, however, because we do not find a series of errors, there is "nothing to cumulate." (*People v. Johnson* (2016) 62 Cal.4th 600, 654.)

## DISPOSITION

The judgment is affirmed.

/s/
EARL, P. J.

We concur:

/s/
ROBIE, J.

/s/
MAURO, J.